IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
December 14, 2011 Session

## CITY OF COOKEVILLE v. MARY JACKSON

**Direct Appeal from the Circuit Court for Putnam County**
**No. 11N0041     Amy V. Hollars, Judge**

**No. M2011-01558-COA-R3-CV - Filed January 19, 2012**

This is a condemnation case.  Appellant, the City of Cookeville, appeals the trial court's grant of summary judgment in favor of Appellee.  The trial court's grant of summary judgment was based upon its determination that the City of Cookeville failed to include Appellee's real property in its application for certificates of public purpose and necessity as required under Tennessee Code Annotated Section 13-16-207(f).  The trial court also awarded Appellee her reasonable attorney's fees and expenses.  Affirmed and remanded.

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Daniel H. Rader, III and Daniel H. Rader, IV, Cookeville, Tennessee, for the appellant, City of Cookeville, Tennessee.

Robert A. Anderson, Nashville, Tennessee, for the appellee, Mary Jackson.

Robert H. Watson, Jr. and Hanson R. Tipton, Knoxville, Tennessee, for the Amicus Curiae, Tennessee Municipal League Risk Management Pool.

Jeffrey G. Jones, Cookeville, Tennessee, for the Amicus Curiae, Putnam County, Tennessee.

### OPINION

Appellee Mary Jackson owns real property that is located both north and south of Lee Seminary Road in Cookeville, Putnam County, Tennessee.  This property, along with the real

property of several other landowners, was annexed into the Appellant City of Cookeville (the "City") in 2002. In the annexation ordinance, the City promised that a sanitary sewer would be provided to the annexed area eventually.[1] As of March 29, 2011, no sanitary sewage service had been provided to the annexed area.

Sometime in 2001, the City developed a long-range plan, referred to as the Sewer System Master Plan, to provide sanitary sewers to the area proposed to be annexed, but the plan had not been implemented prior to the City filing suit against Ms. Jackson. The Sewer System Master Plan was submitted into evidence as Exhibit 2 to the deposition of Ronnie Kelly, the Director of the City's Department of Water Quality Control, and was also filed in support of Ms. Jackson's motion for summary judgment. It is undisputed that the Sewer System Master Plan did not include any reference to the Jackson property that is at issue in this case.

In March 2009, the Building Finance Committee of the Tennessee Board for Economic Growth in the Department of Economic and Community Development for the State of Tennessee issued two Certificates of Public Purpose and Necessity.[2] Certificate

---

[1] The Ordinance specifically provides that:

> Sanitary sewer service will be provided to the annexation area based on the same criteria, standards and policies used to determine the expansion of sanitary sewer service in the unserved portions of the present corporate limits. . . ."

[2] 14 William Meade Fletcher. Fletcher's Cyclopedia on the Law of Private Corporations §6701 (2011) contains a discussion of the certificate of public purpose (or convenience) and necessity. It provides, in relevant part, as follows:

> A certificate of public convenience [or purpose] and necessity, or similar certificate, is often required by law as a condition to operation of certain types of public utilities. The purpose of the law in this regard is to prevent overcrowding of the particular field and restrain cutthroat competition upon the theory that ultimately such competition will increase the costs the public must pay. Such a certificate was unknown to the common law, and the purpose of requiring it is to promote the public service by preventing waste. Such a certificate was required first for railroads; then for street railways; then for other public utilities the operation of which depends upon the grant of some special privilege. . . . The certificate was first introduced into federal law by the now repealed Transportation Act of 1920. Such legislation is constitutional.

(continued...)

number 261 was issued in the name of "Highlands Industrial Park;" Certificate number 262 (together with Certificate number 261, the "Certificates") was issued in the name of "Highlands Business Park." In its brief, the City states that the Highlands Industrial Park and the Highlands Business Park (together, the "Park") was a "dual purpose" park, meaning it has aspects of both a business park and an industrial park. These Certificates were issued for the implementation of the Sewer System Master Plan, which still made no reference to the Jackson property. The application[3] for these Certificates included a two paragraph reference to "Utilities," stating:

> B. Utilities
>
> Water for the proposed park will be provided by the extension of a main feed along the proposed main road from the 30-inch supply line located in the northwest corner of the site. This main line will then extend along this road [,] exit the site just west of Holladay Road then extend up Holladay Road to Gould Drive and tie into the 10-inch line in Gould Drive. The water will be provided by the City of Cookeville and the current system has sufficient capacity and pressure to serve the development according to the City representatives.
>
> As part of the infrastructure improvements, the City proposes to provide sewer service via a combination of gravity lines and force main lines. As much of the site as possible will be served by gravity sewer and taken to a low point located next to Cane Creek just north of Lee Seminary Road. A pump station will then connect to a force main that will run in an east direction along Lee Seminary Road, will cross SR 146— Burgess Falls Road, and then tie into a gravity line that connects to an existing treatment facility that has sufficient capacity to serve a development of this size and use.

---

[2](...continued)
*Id*. (Footnoted omitted).

[3] No application for Certificates is contained in the record. Accordingly, this Court cannot discern whether a separate application was submitted for each Certificate or if a single application was used to obtain both Certificates. Accordingly, the term "application" used throughout this opinion refers to the application or applications used to obtain both Certificates.

The complete application for the Certificates is not contained in the appellate record. However, it is undisputed that, aside from the foregoing "utilities" information, the City provided no other identification of the property involved in the provision of water and sewer for the Park.

Although not originally included in its 2001 Master Sewer Plan, or in the application for the Certificates, at some point, the City realized that the original Sewer System Master Plan would require the addition of a small portion of Ms. Jackson's property in order to provide a pumping station for the sewer project. According to the City, the sewer system would immediately serve 337 acres of private property and private residences in the southwest quadrant of the City and, additionally, in the future, would serve the Park (346 acres) with public utilities. The City would be the owner and operator of the sewer system, which would be a public system. The City would maintain the sewer and all revenue from sewer fees would go to the City.

Without seeking to modify or amend the Certificates, which were issued based on the Sewer System Master Plan, the City sought to purchase the disputed Jackson property. When Ms. Jackson refused to voluntarily sell the property and refused further negotiations with the City, the City filed a complaint for condemnation against Ms. Jackson in the Circuit Court for Putnam County, Tennessee on February 14, 2011. The complaint sought to take a total of .230 acres of the Jackson property adjacent to, and north of, Lee Seminary Road. It also sought a sanitary sewer easement from the edge of the property owned by the City and Putnam County to the edge of the .230 Jackson acres. Moreover, the complaint sought to obtain two permanent slope easements on either side of the total taking (i.e., the .230 acre area). Finally, the complaint sought two temporary construction easements on either side of the sanitary sewer easement.

After she was served with the complaint, Ms. Jackson, through counsel, hired a surveyor to illustrate the size and location of the land to be taken, either for easements or as a complete taking as described in the complaint. One end of the Jackson property sought in the condemnation suit abuts Lee Seminary Road. The other end of the property sought in the condemnation suit abuts the southern edge of the footprint for the park.[4] Ms. Jackson's

_____

[4] In their respective briefs, the parties reference the Park's "footprint," which is another word for the area encompassed by the Park. The original Park footprint contemplated in the Sewer System Master Plan is not the same as the footprint arrived at by Ms. Jackson's surveyor. The difference between the Sewer System Master Plan and Ms. Jackson's survey involves the addition of two pieces of property–one owned by Norma Faye Pyles Lynch, L.L.C. and the other by Ms. Jackson. These pieces of property were not included in the original Park plans when the Certificates were obtained.

(continued...)

survey reveals that none of the Jackson property is contained within the boundaries of the proposed Park that was used to obtain the Certificates (i.e., the Sewer System Master Plan). It is undisputed that the sanitary sewer project, for which the Jackson property is sought, is designed to service the Park and areas outside the Park, although the City argues that Ms. Jackson will ultimately benefit because a sanitary sewer will be provided to her property. As is relevant to this case, the Jackson property is sought for a pumping station that will service the entire sewer system. The City admits that, were it not for the pumping station, the City would not be able to service the Park. According to Mr. Kelly, the pumping station is located where it is because everything from the Parks drains into it.[5]

---

[4](...continued)

***Norma Faye Pyles Lynch, L.L.C. v. Putnam Co***., 301 S.W.3d 196, (Tenn. 2009) ("***Lynch***").

In ***Lynch***, the Tennessee Supreme Court interpreted Tennessee Code Annotated Section 13-16-207(f) to require the city or county to obtain its certificate of public purpose and necessity **before** the city or county may undertake to exercise its power of eminent domain for development of an industrial park . . . even if no funds will be borrowed for the project. ***Lynch***, 301 S.W.3d 196, 212-13. The ***Lynch*** case established the timing for the condemnor to obtain its certificate of public purpose and necessity. In the instant appeal, not only is the timing of the certificate at issue, but also the contents of the certificate. The ***Lynch*** case further bears on the instant appeal insofar as the property obtained in the settlement of the ***Lynch*** case was not included in the original area, or footprint, for the dual use park that is set out in the Sewer System Master Plan. ***Id.*** at 202. Having failed to include the Lynch property in its original plans, and having obtained a certificate of public purpose and necessity for a park footprint that did not include the disputed property, the county asserted, in ***Lynch***, that the issue of its condemnation of the Lynch property was moot. ***Id***. However, the Tennessee Supreme Court held that the issue was not moot even though the city and county had attempted to withdraw their petition for condemnation. ***Id*** at 206. Specifically, the Supreme Court held that the "fact that the City and the County have curtailed their efforts to acquire the disputed property in this case does not necessarily mean that they have abandoned their belief that state law permits them to file a petition to condemn property in order to develop an industrial park without first obtaining the certificate of public purpose and necessity required by Tenn. Code Ann. § 13–16–207(f)." ***Id***. at 207. The ***Lynch*** case ultimately settled, with Putnam County acquiring the disputed property. As is relevant here, the property obtained in the settlement of ***Lynch***, which was not the contained in the certificates of public purpose and necessity, was nonetheless included in the Park footprint, or area, that was arrived at by Ms. Jackson's surveyor. Likewise, Ms. Jackson's property, although not included in either the application for the certificates, or in the original footprint for the Park, was nonetheless included in the ultimate plan because the Jackson property is undisputedly a lynchpin for the Park's sewer plan.

[5] The City has contracted with Highways, Inc. to construct all the infrastructures for the Park, including the pumping station, with a contract price just under thirteen million dollars. It is undisputed in the record that the funds to pay Highways, Inc. have come from the bonds issued pursuant to the receipt of

(continued...)

From our review, the crux of the instant appeal rests upon Ms. Jackson's assertion that the City impermissibly expanded the footprint of the Park to include the Lynch property that became the City's property when the ***Lynch*** case was settled, and to include Ms. Jackson's property, without first seeking to acquire new certificates to include either the Lynch property or Ms. Jackson's property. As explained by Jim Shipley, the City Manager, in his deposition, Ms. Jackson's property was never included in the Park plan:

> Q. Based on . . . your testimony and Exhibit One to [] Mr. Kelley's testimony, would you agree with me that the area that is the subject of this condemnation lawsuit, with respect to Ms. Jackson's property, is not contained within the boundaries of the Highland Park Business and Industrial Park?
>
> A. No, it is not contained within the plan for the park. It's not— let me clarify. It's not owned by the City. . . .
>
> Q. Nor was it on the footprint that was presented to the building finance committee for the State of Tennessee, for the park either, was it?
>
> A. No, it was not.

On March 31, 2011, Ms. Jackson filed a motion for summary judgment. In her motion, Ms. Jackson asserted, *inter alia*, that the City had failed to obtain a certificate of public purpose and necessity as to the Jackson property and that, consequently, the City could not lawfully condemn her property. Ms. Jackson relies upon Tennessee Code Annotated Section 13-16-207(f), which will be discussed below. On April 28, 2011, the City filed its response to Ms. Jackson's motion for summary judgment. Concurrent therewith, the City filed a cross-motion for summary judgment, wherein it relies upon Tennessee Code Annotated Section 29-17-201, which will also be discussed below.

A hearing on the cross-motions for summary judgment was held on May 27, 2011. On June 22, 2011, the trial court entered an Order granting Ms. Jackson's motion for summary judgment, and prohibiting the City from condemning the Jackson property. The trial court, in compliance with Tennessee Rule of Civil Procedure 56.04, made the following

---

[5](...continued)
the Certificates. The City has accounted for these funds in its budget under a category separate from the funds for the Water and Sewer Department, and specifically designated as the "economic development fund" in the City's budget.

thorough and detailed findings in its order:

1. The Court considered which of the two (2) statutes being argued by the parties applies. The Court noted that the City is relying on the general condemnation statute, to wit: TCA §29-17-201. The Court also noted that Ms. Jackson is relying upon TCA §13-16-207(f). Of the two statutes, the Court FINDS that TCA §13-16-207(f) is the more specific statute and does control in this matter.

2. The Court considered a secondary question and that is, given that TCA §13-16-207(f) is controlling, is the reference to the utilities and the plan for utilities to serve the industrial park in the application for the Certificate of Public Purpose and Necessity a sufficient reference to incorporate the Jackson property into the industrial park. The Court CONCLUDES that it is not.

3. The Court FINDS that TCA §13-16-207(b)(1)(B) provides that the Certificate must, in approving the application, make it clear what property may be acquired for the project for the industrial park and the terms upon which the acquisition may be had.

4. The Court FINDS that the Certificate of Public Purpose and Necessity Nos. 261 and 262 do not include this particular property.

5. The Court FINDS that it is clear from the record and the undisputed material facts that the Jackson property is being used in the development of the industrial park because of its topography, which makes it a lynchpin to the sewer project extending out in that direction of the County.

6. The Court also FINDS that it is undisputed that the facts for this condemnation for the sewer line and pumping station come from the bond issue for the industrial park.

7. Under these facts, the Court CONCLUDES that this condemnation is part of the development of the industrial park

and must be dismissed for the failure of the City of Cookeville
to first secure a Certificate of Public Purpose and Necessity for
the condemnation of the Jackson property.

Ms. Jackson subsequently moved the trial court for an award of reasonable attorney's fees, expenses, and discretionary costs. By Order of August 10, 2011, the trial court awarded Ms. Jackson $8,088.30 in attorney's fees, $164.12 in expenses, and $973.00 in discretionary costs.

The City appeals, raising three issues for review. We perceive that there are, in fact, two dispositive issues, namely:

> 1. Whether the trial court erred in granting summary judgment in favor of Ms. Jackson?
>
> 2. Whether the trial court erred in awarding Ms. Jackson her attorney's fees and costs?

In the posture of Appellee, Ms. Jackson asks this Court to award her attorney's fees expended in defense of this appeal, which she argues is frivolously brought by the City.

## Summary Judgment

A trial court's decision to grant a motion for summary judgment presents a question of law. Our review is, therefore, *de novo* with no presumption of correctness afforded to the trial court's determination. ***Bain v. Wells***, 936 S.W.2d 618, 622 (Tenn. 1997). "This Court must make a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied." ***Mathews Partners, L .L.C. v. Lemme***, No. M2008–01036–COA–R3–CV, 2009 WL 3172134, at *3 (citing ***Hunter v. Brown***, 955 S.W.2d 49, 50–51 (Tenn. 1977)).

When a motion for summary judgment is made, the moving party has the burden of showing that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Tenn. R. Civ. P. 56.04. The moving party may accomplish this by either: (1) affirmatively negating an essential element of the non-moving party's claim; or (2) showing that the non-moving party will not be able to prove an essential element at trial. ***Hannan v. Alltel Publ'g Co.***, 270 S.W.3d 1, 8–9 (Tenn. 2008). However, "[i]t is not enough for the moving party to challenge the nonmoving party to 'put up or shutup' or even to cast doubt on a party's ability to prove an element at trial." *Id*. at 8. If the moving party's motion is properly supported, "[t]he burden of production then shifts to the nonmoving party to show that a genuine issue of material fact exists." *Id*. at 5 (citing ***Byrd***

*v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993)). The non-moving party may accomplish this by: "(1) pointing to evidence establishing material factual disputes that were overlooked or ignored by the moving party; (2) rehabilitating the evidence attacked by the moving party; (3) producing additional evidence establishing the existence of a genuine issue for the trial; or (4) submitting an affidavit explaining the necessity for further discovery pursuant to Tenn. R. Civ. P. 56.06." *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008) (citations omitted).

When reviewing the evidence, we must determine whether factual disputes exist. In evaluating the trial court's decision, we review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Stovall v. Clarke*, 113 S.W.3d 715, 721 (Tenn. 2003). If we find a disputed fact, we must "determine whether the fact is material to the claim or defense upon which summary judgment is predicated and whether the disputed fact creates a genuine issue for trial." *Mathews Partners*, 2009 WL 3172134, at *3 (citing *Byrd*, 847 S.W.2d at 214). "A disputed fact is material if it must be decided in order to resolve the substantive claim or defense at which the motion is directed." *Byrd*, 847 S.W.2d at 215. A genuine issue exists if "a reasonable jury could legitimately resolve the fact in favor of one side or the other." *Id*. "Summary [j]udgment is only appropriate when the facts and the legal conclusions drawn from the facts reasonably permit only one conclusion." *Landry v. South Cumberland Amoco, et al.*, No. E2009–01354–COA–R3–CV, 2010 WL 845390, at *3 (Tenn. Ct. App. March 10, 2010) (citing *Carvell v. Bottoms*, 900 S.W.2d 23 (Tenn. 1995)). However, if there is any uncertainty concerning a material fact, then summary judgment is not the appropriate disposition. As stated by our Supreme Court in *Evco Corp. v. Ross*, 528 S.W.2d 20 (Tenn. 1975):

> The summary judgment procedure was designed to provide a quick, inexpensive means of concluding cases, in whole or in part, upon issues as to which there is no dispute regarding the material facts. Where there does exist a dispute as to facts which are deemed material by the trial court, however, or where there is uncertainty as to whether there may be such a dispute, the duty of the trial court is clear. He [or she] is to overrule any motion for summary judgment in such cases, because summary judgment proceedings are not in any sense to be viewed as a substitute for a trial of disputed factual issues.

*Id*. at 24–25.

We have reviewed the entire record and we agree with the trial court that the material facts are undisputed in this matter. Consequently, the sole question before us is whether the

trial court correctly applied the statutory scheme in this case. Several statutes are implicated in our analysis of this issue.

Tennessee Code Annotated Section 9-21-105(22)(B) provides:

> (B) "Public works project" also includes:
>
> (i) "Business park," which includes lands and rights, easements and franchises relating thereto, and may include roads and streets, water, sewer, electric and other utilities, landscaping and related elements as required for the orderly development and use of corporate or professional office space by one (1) or more commercial, financial or service business, and such appurtenant land for necessary incidental use. "Business park" does not include a retail operation except for an incidental retail use. A "business park" shall contain not less than five (5) acres of land. The building finance committee in the industrial development division of the department of economic and community development is authorized and empowered to determine whether a local government shall have the right to engage in any or all of the rights and privileges accompanying such a public works project. Before a local government may undertake the financing of such a public works project, it shall apply to the committee for a certificate of public purpose and necessity. . . .
>
> ***
>
> (ii) "Industrial park," which includes lands, rights, easements and franchises relating thereto, and may include adequate roads and streets, water and sewer facilities, utilities and docks and terminals. Any of the foregoing improvements which are to be located within the geographic boundaries of the industrial park may only be financed after compliance with title 13, chapter 16, part 2 [which includes Tenn. Code Ann. §13-16-207(f)].[6]

---

[6] Again, the parties concede that the Park at issue here is a dual purpose park, including both aspects of a business park and an industrial park.

Tennessee Code Annotated Section 13-16-202(4) defines a "municipality" as "any county or incorporated city or town of this state." Tennessee Code Annotated Section 13-16-207(a)(1)(A) states, in relevant part, that:

> Before a municipality may undertake to borrow funds to develop an industrial park. . . it must obtain a certificate of public purpose and necessity. . . .

Tennessee Code Annotated Section 13-16-207(b)(1)(A), (B), and (C) provide:

> If and when the certificate is issued, the committee therein shall fix and determine:
>
> (A) The extent and the amount to which the municipality may issue bonds or make expenditures for such industrial park;
>
> (B) What property may be acquired therefor; and
>
> (C) The terms upon which such acquisition may be had.

Tennessee Code Annotated Section 13-16-207(d) states, in pertinent part, that:

> (d) When used in this section, "industrial park project" or "project" means the acquisition of land, rights, easements and franchises relating thereto and/or the provision of any roads and streets, water and sewer facilities, utilities, docks and terminals, as well as any appurtenant land that may be reasonably necessary for incidental use thereof. . . .

Tennessee Code Annotated Section 13-16-207(f) provides, in relevant part:

> Before a city or county may undertake to exercise the power of eminent domain for development of an industrial park, it must obtain a certificate of public purpose and necessity. . . even if no funds will be borrowed for the project. . . .

Finally, Tennessee Code Annotated Section 29-17-301 states, in pertinent part:

> All municipal corporations are empowered to take and condemn lands, property, property rights, privileges and easements of

-11-

others for the purpose of constructing, laying, repairing, or extending sewers. . . .

Here, the City relies upon the unfettered right to condemn property for extension of sewers as granted in Tennessee Code Annotated Section 29-17-301. From our review of the record, Ms. Jackson has never asserted that the City, had it secured a certificate of public purpose and necessity, could not exercise its power of eminent domain to condemn her property for a sanitary sewer line. Rather, Ms. Jackson argues that the City has put the proverbial cart before the horse in seeking to condemn her property without first obtaining the required certificate including reference to her property.

As set out in full context above, Tennessee Code Annotated Sections 9-21-105(22)(B)(i) and (ii) provide that both a "business park" and an "industrial park" **may** include sewers. In its complaint, the City makes no reference to the fact that Ms. Jackson's property is being condemned under the Certificates. Rather, the City describes the area being served by the proposed condemnation as being "for improvements along and in the vicinity of Lee Seminary Road." A review of the complaint would provide no notice that the requested taking was primarily to service the Park.

We concede that, if Tennessee Code Annotated Sections 29-17-301 and 9-21-105(22)(B) were the only relevant statutes to consider, then we could conclude that the trial court erred in failing to give proper interpretation to the permissive "may." However, as set out above, at least two additional statutes are triggered in the instant case. From their plain language, Tennessee Code Annotated Section 13-16-207(d) and (f) function to restrict the otherwise unfettered right of the City, under Tennessee Code Annotated Section 29-17-301, to condemn property for the construction of sewers. It is well settled that, "where the mind of the legislature has been turned to the details of a subject and they have acted upon it, a statute treating the subject in a general manner should not be considered as intended to affect the more particular provision." *Arnwine v. Union County Bd. of Educ.*, 120 S.W.3d 804, 809 (Tenn .2003) (quoting *Woodroof v. City of Nashville*, 192 S.W.2d 1013, 1015 (Tenn.1946)). Thus, the provisions of a specific statute will control over conflicting provisions in a general statute. *Id*.

Tennessee Code Annotated Section 13-16-207(d) states, in relevant part, that an "industrial park project . . . means the acquisition of land . . . relating thereto and/or the provision of any. . .sewer facilities. . .as well as any appurtenant land that may be reasonably necessary for incidental use thereof . . . ." Although Tennessee Code Annotated Section 29-17-301 and Tennessee Code Annotated Section 13-16-207(d) address the same issues and may be in conflict in the language specifically addressing the land and related structures for a "sewer facility," the trial court specifically found that:

> It is clear from the record and the undisputed material facts that the Jackson property is being used in the development of the industrial park because of its topography, which makes it a lynchpin to the sewer project extending out in that direction of the County.

There is nothing in the record to contradict this portion of the trial court's findings. Although Tennessee Code Annotated Sections 9-21-105(22)(B)(i), (ii) use the permissive word "may" in stating what may be the components of either a business or an industrial park, Tennessee Code Annotated Section 13-16-207(d) is not permissive when it states that, included in the definition of an "industrial park project," is the acquisition of the land for "sewer facilities," and "all appurtenant land that may be reasonably necessary for incidental use thereof." Consequently, while there could be an industrial park developed in an area where sewer and/or other utilities are already in place (thus, the permissive word "may"), where such project is to occur at a location where no sewer facilities or services are available, Tennessee Code Annotated Section 13-16-207(d) clearly mandates that the footprint of the industrial park must include the land necessary for any sewer facilities and appurtenant land reasonably necessary for the use of that facility that serves the park.

The provisions of Tennessee Code Annotated Section 13-16-207(f) specifically require the City to obtain a certificate of public purpose and necessity **before** it "may undertake to exercise the power of eminent domain for development of an industrial park." *See also Lynch,* 301 S.W.3d 192 (Tenn. 2009). Although Tennessee Code Annotated Section 13-16-207(f) does not specifically require the property to be identified, when read, *in pari materia*, with Tennessee Code Annotated Sections 13-16-207(a) and (b), it is clear that the specific property sought to be condemned must be indicated before a proper certificate may be issued. Specifically, Tennessee Code Annotated Sections 13-16-207 (a) and (b) require the Building Finance Committee of the Tennessee Board for Economic Growth in the Department of Economic and Community Development for the State of Tennessee to determine certain things about the proposed park before it issues a certificate. Among other things, the Board must determine what property may be acquired for the park. Tenn. Code Ann. §13-16-207(b)(1)(B). It is axiomatic that, if the subject property was not included in the application for the certificates, the Board could not make a proper determination of what property may be acquired for the project. A review of the Certificates in this case bear that out.

The Certificates issued here describe the property to be acquired as being those properties "described in [the City's application for the Certificates of Public Purpose and Necessity]." As discussed above, the location of the pumping station and sewer lines, encompassed on Ms. Jackson's undisputed survey is not the same as the 2001 Sewer System Master Plan location for those facilities. Although the City states that they are in

"substantially the same location," Mr. Kelly's deposition testimony indicates otherwise. From our review of the entire record, there is no indication that the footprint for the Park, for which the Certificates were issued (i.e., that contemplated under the Sewer System Master Plan) included any property owned by Ms. Jackson. The trial court specifically found that the Certificates "do not include this particular property [i.e., Ms. Jackson's]." From the record, we agree. The boundary of the footprint of the Park clearly lies north of the Jackson property. There is no indication that the City made any assertion to the contrary, or specifically averred that Ms. Jackson's property was within the footprint of the Park in its complaint or at any other place in the record.

Although the application for the Certificates contained a one-paragraph description of how (and the general area of where) the sewer services would be provided for the Park, there is no indication in the record to suggest that the land specifically described in the application for the Certificates did not already include the land necessary for the pumping station as a "sewer facility." As a result, there is simply nothing in the record to reflect that any of Ms. Jackson's property was being obtained when the Certificates were issued in 2009. Tennessee Code Annotated Section 13-16-207(f) requires the certificates to be obtained before the condemnation. Consequently, in order to properly condemn Ms. Jackson's property in service of the Park's sewer lines, her property would have to be included in the Certificates and it was not.

## Amici Briefs

The Tennessee Municipal League Risk Management Pool ("TML") was granted permission to file an Amicus Brief on September 22, 2011. Putnam County also filed an Amicus Brief. The crux of both of these curiae briefs is that the trial court's ruling preempts the City's right to exercise its power of eminent domain to condemn property for public use. We disagree.

Tennessee Code Annotated Section 29-17-103 provides:

> In event of a conflict between this part and any other statutes granting the authority to use the power of eminent domain by government entities, or those entities to whom the government delegates such authority, this part shall control and shall be construed to protect the private property rights of individuals and businesses, such that private property may only be condemned and taken for legitimate public use as defined in § 29-17-102.

The amici assert that the trial court's ruling was ostensibly that Tennessee Code

-14-

Annotated Section 13-16-207(f) preempted the general condemnation authority set out in Tennessee Code Annotated Section 29-17-301 and, thus, directly violated Tennessee Code Annotated Section 29-17-103. Respectfully, the amici briefs err in their implicit assertion that Tennessee Code Annotated Section 13-16-207(f) is implicated at all in the language of Tennessee Code Annotated Section 29-17-103. By its plain language, Tennessee Code Annotated Section 13-16-207(f) does not confer or grant the power of eminent domain on any governmental entity, nor is it a delegation of that authority to any other entity. Tennessee Code Annotated Section 13-16-207(f) merely addresses the timing of the filing of the condemnation action and establishes a condition precedent to the exercise of the governmental entity's power of eminent domain for the development of an industrial park. As discussed in depth above, no condemnation action that directly involves an industrial park may commence until **after** a certificate of public purpose and necessity, which identifies the specific land to be condemned for the industrial park, is obtained. Thus, when these statutes are read, *in pari materia*, there is no question that the land (related to sewers) for the construction of the Park— including the land for a pumping station (without which the sewer would not properly function), and all easements appurtenant for the reasonably necessary incidental use thereof for the industrial park—can only be condemned if the land for the pumping station (i.e., the Jackson property) has been included in the required certificate of public purpose and necessity. The trial court's ruling in this case merely applies the long-standing principle of statutory construction giving a statute that specifically addresses an issue precedence over a general statute and nothing more.

### Attorney's Fees

When Ms. Jackson hired counsel to represent her in this litigation, a letter was written to memorialize their agreement concerning fees. The letter provides, in pertinent part, as follows:

> Specifically, I have agreed to seek to have this condemnation suit dismissed on basically the same grounds that I succeeded in having the condemnation suit against Dr. Lynch's property dismissed. I agree to a flat fee of $2,000 if that effort is successful in front of the trial court . . . .

> ***

> I will, if successful in having the condemnation case dismissed, seek to have my fees, charged at my hourly rate, paid by the City of Cookeville. The trial court governs how much I am paid by the City of Cookeville. If you pay me in full for my time and I

am then paid any portion of my fees by the City of Cookeville, I will reimburse you for any "overpayment." It is not my intention to be paid by both you and the City of Cookeville at any kind of premium over my normal charges to you. If the trial court approves a "premium" to be paid by the City of Cookeville, however, I will not object.

Based upon the foregoing correspondence, the City now argues that any award of attorney's fees over the $2,000 flat fee contemplated above is error. We disagree.

Tennessee Code Annotated Section 29-17-106(b) states, in relevant part, that:

Notwithstanding the provisions of any law to the contrary, in any condemnation proceeding initiated in this state, the court shall award the respondents a sum that will reimburse them for their reasonable disbursements and expenses, **including reasonable attorney**, appraisal, and engineering **fees actually incurred because of the action**, only if the costs are taxed to the condemnor pursuant to subdivision. . .(a)(1)(C) [i.e., the final judgment is that the condemnor cannot acquire the property or property rights by condemnation]. . . .

An award of attorney's fees in a condemnation action requires an application of the abuse of discretion standard. *See, e.g., **Knox ex rel. Schumpert v. Union Livestock Yard, Inc.**,* 59 S.W.3d 159, 166 (Tenn. Ct. App. 2001). Under the abuse of discretion standard, the trial court's decision "will be upheld so long as reasonable minds can disagree as to the propriety of the decision made." ***Camp v. Camp***, No. W2010–01037, COA–R3–CV, 2011 WL 2567542, at *5 (Tenn. Ct. App. June 29, 2011) (quoting ***Eldridge v. Eldridge***, 42 S.W.3d 82, 85 (Tenn. 2001)). The abuse of discretion standard involves "a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal." ***Lee Medical, Inc. v. Beecher***, 312 S.W.3d 515, 524 (Tenn. 2010) (citing ***Beard v. Bd. of Prof'l Responsibility***, 288 S.W.3d 838, 860 (Tenn. 2009)). The standard "reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives." ***Lee Medical, Inc.***, 312 S.W.3d at 524 (citing ***Overstreet v. Shoney's, Inc.***, 4 S.W.3d 694, 708 (Tenn. Ct. App. 1999)). Accordingly, appellate courts are not permitted to "second guess" the trial court's determinations or to substitute their judgment for that of the trial court. ***Lee Medical, Inc.***, 312 S.W.3d at 524 (citing ***White v. Vanderbilt Univ.***, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999)). "The abuse of discretion standard of review does not, however, immunize a lower court's decision from any meaningful appellate scrutiny." ***Lee Medical, Inc.***, 312 S.W.3d at 524 (citing ***Boyd v. Comdata Network, Inc.***, 88 S.W.3d 203,

211 (Tenn. Ct. App. 2002)).

Under Tennessee law, contract provisions must be interpreted in the context of the entire contract, viewed from beginning to end, and all terms must pass in review, for one clause may modify, limit or illustrate another. *See, e.g.,* **D & E Const. Co., Inc. v. Robert J. Denley Co., Inc.**, 38 S.W.3d 513, 519 (Tenn. 2001). As set out above, although the first paragraph of the letter between Ms. Jackson and her attorney contemplates a $2,000 fee, when viewed in light of the second paragraph of the letter, it is clear that the $2,000 payment would apply in the same manner as a contingency fee contract, with an advance payment (of $2,000) applying against the contingency. Although the City argues that Ms. Jackson will only be charged a flat fee of $2,000, this is not the full arrangement expressed in the correspondence. The letter clearly contemplates that Ms. Jackson's attorney will look to the City for an award of all of its time at the normal hourly rate of $300 if successful, and that he would reimburse Ms. Jackson for any fees awarded up to the $2,000.

There is no indication in the record, and the City has not provided any counter evidence, to support a finding that Ms. Jackson's attorney did not perform the services or incur the time as set out in the affidavit of fees and expenses. The trial court made a specific finding that the 49.02 hours of time spent by Ms. Jackson's attorney was reasonable; however, the trial court did reduce the hourly rate for those services, finding that the rate of $300 was excessive and that an hourly rate of $165 was appropriate. From the totality of the circumstances, we conclude that there was no abuse of discretion in awarding fees in compliance with Tennessee Code Annotated 29-17-106(b) over and above the $2,000 fee paid by Ms. Jackson.

Finally, Ms. Jackson argues that the City's appeal is frivolous and that she should be awarded her reasonable attorney's fees expended in defense of this appeal pursuant to Tennessee Code Annotated Section 27-1-122.[7] "Imposing a penalty for a frivolous appeal is a remedy which is to be used only in obvious cases of frivolity and should not be asserted lightly or granted unless clearly applicable, which is rare." **Henderson v. SAIA, Inc**., 318 S.W.3d 328, 342 (Tenn. 2010). Although we have not decided the issues before us in the

---

[7] Tennessee Code Annotated Section 27-1-122 states:

> When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award just damages against the appellant, which may include but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.

City's favor, we are not persuaded that this appeal is frivolous or taken solely for delay. However, while we cannot find that the instant appeal is frivolous, we nonetheless concede that, under the plain language of Tennessee Code Annotated Section 29-17-106(b), as the prevailing party, Ms. Jackson would be entitled to her reasonable attorney's fees and costs in defense of this appeal. We, therefore, remand the case to the trial court for the sole purpose of determining the amounts of those fees and expenses.

For the foregoing reasons, we affirm the order of the trial court and remand for determination of reasonable attorney's fees and costs expended by Ms. Jackson in defense of this appeal, and an award of same under Tennessee Code Annotated Section 29-17-106(b). Costs of this appeal are assessed against the Appellant, City of Cookeville.

_____
J. STEVEN STAFFORD, JUDGE